State v. Murphy, 128 Wis. 201.

CASSODAY, C. J., took no part.

—————————————

THE STATE VS. MURPHY.

*March 28—April 17, 1906.*

*Immunity from prosecution: Person testifying before grand jury: Extent: Privilege of witness: Separate trial on issue of immunity: Questions certified to supreme court: Form.*

1. Under sec. 4078, Stats. 1898, as amended by ch. 85, Laws of 1901 (providing that in certain proceedings no person shall be excused from testifying on the ground that his testimony may expose him to prosecution for any crime, etc., but that no person shall be prosecuted "for or on account of any transaction, matter, or thing concerning which he may testify"), the immunity from prosecution is not broader than the constitutional privilege of the witness (Const., art. I, sec. 8) as to self-crimination.

2. One who was subpœnaed, sworn, and examined before the grand jury, answering only the questions asked, but making no objection to them, is entitled to such immunity as the statute confers, as to transactions concerning which he so testified.

WINSLOW, J., dissents, being of the opinion that, in order to gain the immunity, the witness must be *compelled* to testify, and that compelling a person to appear by subpœna cannot properly be considered as compelling him to testify.

MARSHALL and KERWIN, JJ., are of the opinion that the immunity is given only where the witness testifies under real com-

pulsion, not mere right of compulsion; that is, there must be coercion to the extent of the witness being called to testify under such circumstances that he would be liable to punishment as standing in defiance of the court if he refused to do so.

3. It is not necessary, in order that there may be immunity from prosecution, that the witness should have given evidence adverse to himself, or that he should have told the truth.

4. An alderman, giving evidence before the grand jury, answered in the negative the question whether he had received any money for his vote on special privileges, bay windows, sidetracks, etc. *Held*, that he did not thereby testify concerning the transaction, matter, or thing for or on account of which he was afterwards prosecuted upon an information charging that he had solicited and received a certain sum to induce him to vote in favor of an ordinance allowing certain persons to lay a sidetrack across certain streets.

5. The question whether a special plea of immunity should be tried separately or in conjunction with the plea of not guilty was not a proper one, in that abstract form, to be certified to the supreme court under sec. 4721, Stats. 1898, but is treated as being in effect a question whether error was committed in the particular case by such separate trial.

6. Where defendant requested a separate trial of the issue on the plea of immunity, and the information fully set out the matter on account of which he was attempted to be prosecuted, such separate trial was not error.

REPORTED from the circuit court for Milwaukee county: ORREN T. WILLIAMS, Circuit Judge.

On February 1, 1904, an information was filed against the defendant charging that on the 17th day of June, 1899, he, then being an alderman of the city of Milwaukee, Wisconsin, solicited and received from Oscar F. Davis $80 for the purpose of inducing accused to vote in favor of a then pending ordinance allowing said Davis's firm to lay a sidetrack across certain streets in said city of Milwaukee. After reversal of the first conviction (124 Wis. 635, 102 N. W. 1087) the action was again brought to trial, the defendant having interposed both a plea of not guilty and a plea in bar for that, before a grand jury sitting on the 9th day of January, 1902,

charged with the duty of investigating such offenses, defendant attended and gave testimony as to the transactions, matters, and things alleged in the information, by reason whereof the defendant claimed he could not be prosecuted or subjected to any penalty or forfeiture therefor. The case being reached for trial, defendant's attorneys called attention to the plea in bar, and stated that was the first thing to be heard and tried, to be followed, if necessary, by the plea of not guilty, to which the court responded, "that will be the order of procedure." Accordingly, jury being impaneled, trial on the special plea proceeded, where was proved the instructions to the grand jury to consider all malfeasance in office on the part of city and county officers with a reference to the statutes against bribery; also offer of proof that defendant was subpoenaed to attend on the 9th day of January, 1902, and did so. They then called the clerk of the grand jury and produced his minutes, showing that defendant was produced as a witness, sworn, and was asked and answered questions. The minutes of testimony read thus: "Ald. *Wm. Murphy,* alderman Third ward, serving second term, sworn: Know Fred Schultz, J. M. Clarke, Mr. Walker. Know of no alderman or public official demanding or receiving money to support any contract, special privilege, or franchise. Never had conversation with Schultz, or any other newspaper man, about special privilege for electric signs." Witness stated: "That does not purport to give the questions asked *Mr. Murphy;* only a synopsis of the answers."

Thereupon defendant testified that he was subpoenaed, sworn, and examined by the district attorney, and was asked "if I received any money for my vote on special privileges, bay windows, sidetracks, electric light, street railway extensions, I, or any of the aldermen or city officials," and that he answered such questions. Also that the district attorney "asked me if I got any money for sidetrack privileges or if I knew any alderman or any city official that had received

money for their influence, their vote—I answered him." "I answered these questions under oath . . . I answered fully all questions asked me while a witness before the grand jury." The ordinance granting Davis Bros. a right to lay a sidetrack was introduced and passed before the examination before the grand jury.    On cross-examination he stated that he had no recollection of being cautioned that he need not give evidence which, in his opinion, would criminate him, but he could not swear positively; that he gave his testimony voluntarily and offered no objections to the questions asked him, and that the minutes kept by Mr. Moravitz are not a full report of the testimony he gave; that he did not volunteer any evidence, only answered what he was asked, and gave his testimony be-cause he was subpœnaed to go before them and was asked questions by the prosecuting attorney, but freely and voluntarily.

Mr. Goff, assistant district attorney, stated that the witnesses (before the grand jury) were instructed that they need not incriminate themselves; also that the attention of the district attorney had not been called to ch. 85, Laws of 1901.

Thereupon, on motion of the district attorney, the court directed the jury to find a verdict in favor of the state, which they accordingly did, and to which action defendant duly excepted.    Then the trial upon the plea of not guilty proceeded and defendant was convicted of the charge set forth in the information.    Thereupon the court, deeming that certain questions were doubtful and important, certified the following for answer, viz.:

"(1) Was the evidence, all of which is herewith certified, sufficient to immune the defendant under the provisions of sec. 4078, Stats. 1898, as amended by ch. 85, Laws of 1901?[1]

[1] Sec. 4078, Stats. 1898, as amended by ch. 85, Laws of 1901, is as follows:

"No witness or party in an action brought upon the bond of a public officer, or in an action by the state or any municipality to recover public money received by or deposited with the defendant, or in any action, proceeding or examination, instituted by or in behalf of the

"(2) Did the court err in directing a verdict against the defendant and in favor of the state on the special plea in bar herein, under the evidence?

"(3) Should the plea of immunity be tried separately, or in conjunction with the plea of not guilty?"

For the plaintiff there was a brief by the *Attorney General* and *A. C. Titus,* assistant attorney general, and by *Francis E. McGovern,* district attorney, and *Guy D. Goff,* assistant district attorney, of counsel, and oral argument by *Mr. McGovern.*

*J. M. Clarke,* for the defendant.

DODGE, J.  In presenting the first question certified, counsel have discussed many general considerations bearing upon the purpose and scope of this immunity statute which, in its exact form and words, originated with Congress in Act February 11, 1893, ch. 83, 27 Stats. at Large, 443 [3 U. S. Comp. Stats. 1901, p. 3173]. The counsel for the state insists that its only purpose is to enable the obtaining of evidence which by the fourth and fifth amendments to the constitution of the United States a witness is privileged to withhold but for such a statute, hence that it must be construed as intending to grant immunity only broad enough to accomplish that result; only such as must be granted in order to evade the constitutional privilege of silence as to self-criminatory facts.  But must we assume that the statutory immunity is no broader than the constitutional privilege of a witness to withhold evidence which may be used against him in a criminal case?  The legislature, of course, might refrain from invading private liberty up to the full limit that the constitution permits, just

state or any municipality, involving the official conduct of any officer thereof, shall be excused from testifying on the ground that his testimony may expose him to prosecution for any crime, misdemeanor or forfeiture.  But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify, or produce evidence, documentary or otherwise, in such action, proceeding or examination, except a prosecution for perjury committed in giving such testimony."—REP.

as individuals may, and some do, refrain from disturbing their neighbors' comfort up to the full limit permitted by law. If the words of the act in question, reasonably considered, do fairly promise a broader immunity than could have been secured had the constitutional privilege of silence been exercised, why should they not be given effect. No court can presume that the legislature acted in bad faith or with intent to mislead or deceive. *Great Falls Mfg. Co. v. Att'y Gen.* 124 U. S. 581, 599, 8 Sup. Ct. 631. Hence any promise such as this is to be at least fairly construed in favor of one who in consideration thereof is deprived of a valuable right. Is there anything in the history of this legislation so clearly limiting the legislative intent that it should control the words used to express it?

In an effort to reach certain crimes which involved complicity of two or more persons and, ordinarily, could not be proved without the testimony of some of those concerned, Congress had enacted that no such testimony "shall be given in evidence, or in any manner used against such party or witness," etc. Notwithstanding this statute, Counselman, a grain dealer, refused to answer to a grand jury whether he had obtained any rebates or cut rates from railroads, also whether he knew of any such favor being allowed any shipper in Chicago. The supreme court of the United States sustained him in such refusal by unanimous decision, where was considered exhaustively, in the light of all prior adjudications, the true construction of the constitutional right of silence as to criminatory matters. It was held that this right is a highly favored one, the preservation of which is more important and sacred than any considerations of convenience of government in discovering or punishing crime; that it reaches not only disclosure of actual crime, but of any fact however apparently innocent in and of itself which might under any circumstances aid in supplying a link in a chain of circumstantial evidence of a crime, or even might constitute a source

or means from which or by which evidence of its commission or of his connection with it may be obtained or made effectual for his conviction, without using his answers as direct admissions against him. *Counselman v. Hitchcock,* 142 U. S. 547, 585, 12 Sup. Ct. 195, 206; a view sustained by MARSHALL, C. J., 1 Burr's Trial, 244; *Boyd v. U. S.* 116 U. S. 616, 6 Sup. Ct. 524; *Bram v. U. S.* 168 U. S. 532, 18 Sup. Ct. 183; *People ex rel. Taylor v. Forbes,* 143 N. Y. 219, 38 N. E. 303; *Emery's Case,* 107 Mass. 172; *Thornton v. State,* 117 Wis. 338, 341, 93 N. W. 1107. Upon this construction of the constitution it was held that the statute then under consideration merely prohibiting the use in evidence in any proceeding against him of the testimony a witness might have given in other described proceedings, was not equivalent to the protection resulting to him from the constitutional privilege to remain silent, and that nothing short of complete immunity from prosecution or punishment could be so equivalent; that unless the statute made it impossible that there should be a "criminal case" against him which might be aided in the way described by some answer to the questions propounded he still might refuse to answer.

This case has since been followed in nearly all the states where either the construction of a similar constitutional guaranty or an immunity statute has been considered, although in some of them a different view had previously been declared; notably in New York, where the court of appeals has expressly overruled *People ex rel. Hackley v. Kelly,* 24 N. Y. 74, which was considered the leading adverse case by the supreme court of the United States. *People ex rel. Lewisohn v. O'Brien,* 176 N. Y. 253, 68 N. E. 353. In the *Counselman Case* the court not only decided the inability of Congress to infringe upon this right of silence and the broad and liberal construction which must be accorded the constitutional guaranty, but by original statement and apt quotation dwelt on the sacredness of that right and the tyran-

nical and despotic character of attempts by government to out-
rage the privacy of the individual, in emphasis of the impro-
priety and inconsistency of any, even the first and most in-
sidious, step in that direction by a government created by the
people for the primary purpose of assuring and protecting
individual liberty.

To this admonition from the court Congress responded by
enacting, in modification of the former attempted legislation,
the statute of 1893, which, as far as material, provided:

"No person shall be excused from attending and testifying
or from producing books, papers, tariffs, contracts, agree-
ments and documents [in certain proceedings] on the ground
or for the reason that the testimony or evidence, documentary
or otherwise, required of him, may tend to criminate him or
subject him to a penalty or forfeiture. But no person shall
be prosecuted or subjected to any penalty or forfeiture for or
on account of any transaction, matter or thing, concerning
which he may testify, or produce evidence, documentary or
otherwise, before said commission. . . . Provided, that no
person so testifying shall be exempt from prosecution and
punishment for perjury committed in so testifying." Act
Feb. 11, 1893, ch. 83, 27 Stats. at Large, 443 [3 U. S. Comp.
Stats. 1901, p. 3173].

It will be noticed at once that this statute is replete, almost
to tautology, with broadening repetitions and synonyms, which
strongly suggest an effort to assure as broad a field of im-
munity as words could well express, and the query is at once
suggested whether such evident industry of expression is not
significant of an intent not alone to satisfy the exact restric-
tions imposed by the constitution, but to defer broadly to the
governmental duty of protecting amply and generously the
individual right of privacy, the sacredness of which had been
so impressively stated in the *Counselman Case*. Especially
are such expressions significant when we remember that much
more limited ones have been held to satisfy the prohibition
contained in the constitution. Thus, in New Hampshire, it

has been held sufficient to that end to declare immunity from any crime which a witness's testimony "disclosed" (*State v. Nowell,* 58 N. H. 314) ; and in California and Tennessee to immune a witness from an "offense as to which he testifies" (*Ex parte Cohen,* 104 Cal. 524, 38 Pac. 364; *People v. Sternberg,* 111 Cal. 3, 43 Pac. 198; *Hirsch v. State,* 8 Baxt. 89). Can it be doubted that Congress meant something broader than "offense" or "crime" by the expression "any transaction, matter or thing," or that they meant something more than "disclosed" by "concerning which he testifies" ? In *Brown v. Walker,* 70 Fed. 46, 49, the act of 1893 was first held valid, and the court there declared that "In practical effect the legislative act throws a greater safeguard around the petitioner than the constitutional provision." This decision was affirmed by the supreme court in *Brown v. Walker,* 161 U. S. 591, 16 Sup. Ct. 644, where it was held that the constitution did not pretend to excuse one from disclosing facts tending merely to disgrace him. The only other review of this statute in that court is *Hale v. Henkel,* 201 U. S. 43, 26 Sup. Ct. 370, holding that the constitution does not privilege a witness to refuse to answer a question of which the answer cannot tend to criminate him personally, although it may tend to criminate a corporation of which he is an officer. In the *Packers' Case (U. S. v. Armour & Co.* U. S. Dist. Ct. N. D. Ill.,.March 21, 1906), 142 Fed. 808, 822, the court expressed its views upon the relative scope of the constitutional privilege and the statutory immunity thus:

"Now, in my judgment, the immunity law is broader than the privilege given by the fifth amendment, which the act was intended to substitute. The privilege of the amendment permits a refusal to answer. The act wipes out the offense about which the witness might have refused to answer. The privilege permits a refusal only as to incriminating evidence. The act gives immunity for evidence of or concerning the matter covered by the indictment [testimony] and the evidence need not be self-incriminating. The privilege must be

personally claimed by the witness at the time. The immunity flows to the witness by action of law and without any claim on his part."

We do not adopt in full either the views of Judge HUMPH-REY, or the expression of them, as to the construction of this statute in detail, but quote them merely as evincing his opinion that no predetermined purpose is to be presumed that the immunity granted shall be strictly confined to that guaranteed by the constitution if a broader intent is shown by the words used when they come to be construed.

Another consideration which might well have had weight in framing such legislation was the removal of all inconvenient disputes and uncertainties as to the scope of inquiry to which the witness might be subjected in the effort to learn facts upon which others might be charged, so that he might not obstruct the examination by objecting to disclosure of apparently remote and immaterial matters by raising the possibility that his answers might be criminatory as to some matter unknown to the tribunal so that, therefore, it might be unable to overrule his objection. In view of the great difficulty of discovering and punishing any one for these crimes it was at least possible to have been thought best to make the immunity so broad and attractive as to enhance the probability that one would be tempted to disclose the guilt of his associates; it being deemed wise policy to establish even a probability of punishment of some in place of the existing almost certain inability to vindicate such criminal statutes at all. For these reasons we do not find any necessary or irresistible presumption that there could have been no legislative intent to provide any immunity which would not have resulted from according accused merely the privilege of silence guaranteed him by the constitution, but must presume that the words of the statute mean what they say, construed, like all other statutes where there is any ambiguity, in the light of the surrounding circumstances and general purpose so far

as known.   Our statute (ch. 85, Laws of 1901) is obviously an adoption of the federal act, except as the field of suspension from constitutional protection is broadened somewhat.

It is upon this presumption in favor of a strictly limited intent in this legislation that counsel for the state bases a contention that unless a witness resists answering a question, at least to the extent of asserting that the answer may tend to criminate him and that he claims his constitutional privilege to refuse answer, no immunity from prosecution is earned by him.    To this position there are two answers: first, that the statute in terms imposes no such limitation upon the immunity, for it assures it to any person who "may testify," not who may be compelled to testify or who may testify after first refusing or protesting and asserting his constitutional right.    Doubtless no criminal can immune himself by volunteering evidence without lawful demand.    But a more obvious answer is that the law, giving the prosecuting officers and the investigating tribunal the power and right to demand the answer; the subpœna commanding attendance; the administering the oath, and the putting the question, deprive the witness of any privilege to withhold the information, or to effectively protest, and notify him that the tribunal absolutely demands the testimony.   A declaration that he would like to assert that privilege if he had it, when by the very proceeding he is warned that he has it not, would be so entirely futile as to be puerile.    What sense in his asking whether the information is insisted on when all the steps taken constitute most unambiguous insistence?    Why assert a privilege when he has none?    That he has none is certain, if this statute be given effect according to its terms, for it precludes the possibility of any "criminal case" in which his testimony can be "against" him in the sense forbidden by the fifth amendment to the federal constitution and, in identical words, by sec. 8, art. I, Const. Wis.    *Brown v. Walker,* 161 U. S. 591, 16 Sup. Ct. 644; *Hale v. Henkel,* 201 U. S. 43,

26 Sup. Ct. 370. This view was taken in the only case in
the United States courts yet decided, where the question
has been considered. *Packers' Case* (U. S. Dist. Ct. N. D.
Ill., decided March 21, 1906), 142 Fed. 808. Subpœna,
oath, and question have in many cases been held to prevent
any inference of voluntariness of testimony from one who
does not know his right to refuse. Why not equally so if
from one who has no such right? *People v. Mondon,* 103 N.
Y. 211, 8 N. E. 496; *State v. Young,* 119 Mo. 495, 24 S. W.
1038; *State v. Clifford,* 86 Iowa, 550, 53 N. W. 299; *Bram
v. U. S.* 168 U. S. 532, 18 Sup. Ct. 183. Needlessness of
protest in presence of a demand from one having authority
and power to enforce it has often been declared. *U. S. v.
Lawson,* 101 U. S. 164; *U. S. v. Ellsworth,* 101 U. S. 170;
*Swift Co. v. U. S.* 111 U. S. 22, 4 Sup. Ct. 244; *Mosby v.
U. S.* 133 U. S. 273, 10 Sup. Ct. 327. We are satisfied that
the circumstances under which defendant was called on to
give his testimony were such as to entitle him to invoke such
immunity from prosecution and punishment as the statute
confers, and need not discuss the question whether one can
by his own initiative and volition, without demand by any
authorized person or tribunal, seek shelter under this law.

Another position founded on the same premise is that,
because the constitutional privilege is to refrain merely from
giving evidence against himself, a witness is immune from
prosecution only when he gives evidence which is adverse to
him. The difficulty with this position is, again, that the
statute makes no such limitation; it in terms confers im-
munity when he testifies at all concerning a transaction, mat-
ter, or thing for or on account of which prosecution may be
attempted. Indeed, if limited as counsel contends, the im-
munity would not be as broad as the constitutional privilege,
for the latter is to refuse to answer a question at all if any
answer the witness might give to such question might tend to
criminate him. That is by no means satisfied by immunity

only when the answer given does tend to charge him with the particular crime to which he pleads it.

Another suggestion is made to the effect that, unless the witness tells the truth, he cannot be said to testify concerning that of which he speaks. This would involve a highly technical and unusual meaning for the word "testify," which ordinarily means the making of any statement under oath in a judicial proceeding. 8 Words & Phrases, 6932, 6933. The statute itself, however, refutes any such meaning, for it expressly reserves the right to prosecute for perjury "in giving such testimony," thus recognizing that the word "testimony" is used in a sense broad enough to include statements which are false.

Whatever general rules of construction should apply to this statute, whenever immunity is claimed under it the question arises whether defendant did, in any reasonable sense, testify concerning the transaction, matter, or thing for or concerning which he is prosecuted. The strongest evidence is defendant's own testimony that he was asked "if I received any money for my vote on special privileges, bay windows, sidetracks, electric light, street railway extensions—I, or any of the aldermen or city officials." This he answered in the negative. The charge in the information is that he did, on June 17, 1899, ask, solicit, demand, and receive from one Davis $80 in money for the purpose of influencing the action of the common council and of himself to grant, and vote in favor of granting, privilege to lay railroad track over and across a certain public street. Did he testify concerning that transaction, matter, or thing? The very statement of the situation seems to suggest a negative answer. While the denial that a specified interview or transaction took place, or that in a known and defined interview an act was or was not done, may, and perhaps must, be deemed testifying with reference to that transaction, a mere negative answer to a broad and general question as to the existence of any transactions of a

certain kind, in a proceeding for discovery, without hint or suggestion that the inquirer has in mind any particular occasion, is no more than a declaration by the witness that he cannot testify concerning any transaction in such category. If, in fact, any such event occurred to the knowledge and memory of the witness, his negative answer is a most effective method of refusing to testify concerning it; more effective than invoking his constitutional privilege of silence, for, in that case, the court might compel him to answer if convinced that in no contingency could any answer tend to criminate him. The situation is not in analogy with that presented under sec. 4069, Stats. 1898, prohibiting a party from testifying in respect to any transaction with a deceased person, for there the negation of any interview may suffice to lift the burden of proof resting on the living party which his opponent is unable to meet in any way. *Brader v. Brader,* 110 Wis. 423, 428, 85 N. W. 681; *Howell v. Van Siclen,* 6 Hun, 115, affirmed 70 N. Y. 595; *Haughey v. Wright,* 12 Hun, 179; *Maverick v. Marvel,* 90 N. Y. 656; *Van Sandt v. Cramer,* 60 Iowa, 424, 15 N. W. 259; *Ridler v. Ridler,* 93 Iowa, 347, 351, 61 N. W. 994. But even there parties have been permitted to deny generally facts alleged by others to have occurred at some such transaction without being deemed to testify in respect to any transaction. *In re Estate of Edwards,* 58 Iowa, 431, 10 N. W. 793; *Pettit v. Geesler,* 58 How. Pr. 195; *McMillan v. Stern,* 28 N. Y. Supp. 596; *Pinney v. Orth,* 88 N. Y. 447; *Lewis v. Merritt,* 98 N. Y. 206; *Funson v. Salisbury,* 15 App. Div. 214, 44 N. Y. Supp. 205. Indeed, in some cases direct testimony that an interview either did take place or that it did not has been held not testifying concerning the transaction. *Hier v. Grant,* 47 N. Y. 278; *Richards v. Munro,* 30 S. C. 284, 289, 9 S. E. 108; *Griffin v. Earle,* 34 S. C. 246, 253, 13 S. E. 473; *Trimmier v. Thomson,* 41 S. C. 125, 19 S. E. 291; *Andrews v. Hunt,* 7 Mackey, 311, 315. These are, however, against the clear weight of authority and

reason, except as some of them may be harmonized on the ground that the mere fact of the interview may be immaterial and the admission of the testimony, therefore, nonprejudicial as explained in *Maverick v. Marvel,* 90 N. Y. 656.

When that answer "No" was given, the progress of investigation to discover from this witness anything concerning the transaction now charged was checked at the very threshold, unless, indeed, the grand jury had some other information of it, so as to enable specific inquiry of the witness. We are persuaded that we should but travesty the statute should we hold that a declaration that he could give no evidence of any transactions within a general class constituted testimony concerning one. That such testimony, if wilfully false, may subject a witness to a charge of perjury, has no application to the subject. The statute does not grant general immunity merely because one gives testimony which may result in a charge of perjury, but only immunity from prosecution for or on account of some transaction, matter, or thing concerning which he testifies.

This view is even more obvious with reference to the question and answer whether money was paid to any other alderman or city officer. There is nothing proved to indicate that the district attorney had any particular instance in mind or that defendant supposed he had. When, therefore, defendant answered the question "No," he in effect refused to testify concerning any transaction, if he knew of any. The whole situation and attitude is in negation of the idea that he did testify concerning one, in any reasonable sense of the statute.

For the reasons stated we are satisfied that there was absolutely no evidence that defendant did, before the grand jury, testify or produce any evidence of or concerning any transaction, matter, or thing for which he is prosecuted in this case; hence that the evidence was not sufficient to immune him, and the first question certified must be answered in the negative.

The second question certified must be answered in the negative also. From what we have already said, our conclusion is that as matter of law there was no evidence to establish the plea of immunity from prosecution, in which case it is proper for the trial court upon the separate trial of such plea in bar to direct a verdict against it. *Murphy v. State,* 124 Wis. 635, 102 N. W. 1087.

The third question is not in proper form for certification to this court under sec. 4721, Stats. 1898, which, as already decided, authorizes only the submission of questions which have actually arisen on the trial of the cause and not abstract ones which may arise in the future. *State v. Hickok,* 90 Wis. 161, 62 N. W. 934. The case having been tried, and verdict both upon the plea in bar and upon the general plea of not guilty having been rendered, there can be no material question except whether the procedure in fact taken with reference to the trial of the special plea was so erroneous that judgment should not follow the verdict. We think, however, that we may treat the question framed by the court below as in effect a report of his need to be advised upon that which is really before him, and, so considering it, we think that no error was committed in the present case: First, because the defendant requested a separation of the issues and a preliminary trial of that upon the plea in bar; and, secondly, because no prejudice could result to him in this case, since the information fully and adequately set out the transaction, matter, and thing for or on account of which he was attempted to be prosecuted. Doubtless there may be cases where such a plea of immunity in bar cannot be intelligently tried until the evidence for the state is presented fully disclosing the transaction and the facts upon which guilt is charged, and where, therefore, a preliminary trial of such issue might be impracticable and prejudicial to the accused.

*By the Court.*—We answer the first question: No. We answer the second question: No. We answer the third question: No error was committed in that respect in this case.

State v. Murphy, 128 Wis. 201.

MARSHALL, J.[1]  I concur in the answers to the questions certified for decision, but dissent, most emphatically, from the general exposition of the immunity statute which precedes the treatment of the particular points involved.

In view of the fact that in recent years there has been apparently great need for a vigorous prosecution and certain punishment of offenders and a significant awakening of appreciation in that regard, we must assume that the legislature had no other purpose in passing the immunity statute than to give aid in that respect.  In that light, the law, as construed in the opinion by my brother DODGE, seems to be a most absurd enactment.  If the legislature had devoted the most careful study to the subject of how best to furnish offenders an easy method of escaping the consequences of their wrongdoing: of practically, in great measure, paralyzing the administration of justice in criminal matters, it could hardly have been more successful, if the intent embodied in the immunity law is as suggested in the opinion on file.

I had no idea, when the opinion was handed down, that it contained what would be considered by trial courts, as it seems will be the case, a most emphatic approval of the very extreme view, I venture to say, expressed by Judge HUMPHREY in the *Packers' Case,* 142 Fed. 808, and indicated in the quotation from his opinion of the federal immunity statute on which ours was modeled.  I did not appreciate that the court was committed to the idea that such statute was intended to, and in fact does, go very much farther than the constitutional guaranty against compulsory self-crimination; that its purpose was to go so far beyond the scope thereof as

[1] Note by MARSHALL, J.  In order that this and the other independent opinions in this case may be understandingly read it seems best to say this: The paragraph in the main opinion commencing with "We do not adopt," etc. (*ante,* p. 210), which immediately follows the quotation from the *Packers' Case,* was added to such main opinion after the independent opinions were filed, so as to remove from such main opinion any indication contained therein of indorsement by the court of the quoted doctrine.

to not only secure the evidence which the privilege of silence would otherwise obscure, but, by affording the offender a sort of *gratuity,* obtain disclosures which, but for moral turpitude,. he could be compelled to make any way: disclosures of mere circumstances so remote as not to fall within the scope of self-incriminatory evidence. Nothing could have been further from my thoughts than that the legislative purpose was to make the inducement to testify "attractive" by holding out a substitute for the constitutional privilege, and a bribe, so to speak, as to matters beyond its scope as well. I wish, as emphatically as practicable, to express my dissent from any such extreme view. I had supposed that, with nearly a unanimous voice, it was condemned when the case was decided preparatory to writing the opinion. My brother DODGE,. however, had a right to suppose that his treatment of the matter was acquiesced in, at least, since no one objected when the opinion was read. I do not intend by anything said here to criticise my brother in the slightest respect. The fault, if there be any, is not his. For myself, I confess fault. I did not appreciate what was said in the opinion. I did not give the attention thereto that I should have done, though there is a fairly good excuse therefor, which, however, need not be stated here.

Under the circumstances I shall not attempt to discuss the immunity statute, giving reasons and authorities for the views. I entertain. Some other occasion will doubtless be presented for further consideration of the matter. That I am persuaded to believe by the fact, in part, as I understand it, that there is a radical conflict between the exposition of the law,. from which I dissent, and that in the case decided with it,. opinion by Justice SIEBECKER, with which I concur. I shall content myself for now by a mere statement of the conclusions. which I had supposed were in accordance with the idea of a majority, at least, of the members of the court participating in the decision.

The purpose of the immunity statute was to take the place of the constitutional privilege against self-incriminatory evidence. It was designed to open the doors in just so far as such privilege would otherwise hold them closed by the right of silence. Its scope, therefore, coincides with such privilege, stopping not short of it, nor going beyond it.

The exposition of the federal statute by Justice HUMPHREY in the *Packers' Case,* quoted from by my brother DODGE, viewed as applicable to statutes of which ours is a type, I believe, goes altogether too far and will not stand the test which will be applied to it.

(1) The statute does not wipe out the offense about which the witness might have refused to answer. It creates a bar to a prosecution for the offense. The offense with its attendant moral turpitude is left just the same, but by force of the statute the public is remediless.

(2) The statute is not broader than the constitutional guaranty for which it was intended to be a "substitute." The very idea of a substitute suggests the limitation of one as that of the other. In other words, that they are equivalents, one being exchanged, by force of the law, for the other.

(3) The statute does not immune because of evidence given other than that of a self-incriminatory character; such as without the statute would be obscured by the constitutional privilege of silence.

(4) For the statute to operate there must be evidence under real compulsion, not mere right of compulsion. That is, there must be coercion to the extent of the witness being called to testify under such circumstances that he would be liable to punishment as standing in defiance of the court if he refused to do so. In that situation only does the law relieve him from the necessity of expressly claiming his privilege. Until the law then lays its hand on the party so that resistance would be a defiance of the court, the statute does not intervene.

(5) In the term "no person shall be prosecuted or subjected to any penalty for or on account of any transaction, matter, or thing, concerning which he may testify or produce evidence," etc., the term "transaction, matter, or thing" has reference to any of the designations: to an event of a criminal character. Each is one of a species, a synonym, in great part, for either of the others. The familiar rule *noscitur a sociis* applies. The evidence spoken of is evidence of an incriminating character, as to a transaction giving rise to a cause of action to punish for a crime, or a thing giving rise to such cause, or a matter giving rise to some such cause, in which the witness participated. It has no reference to any remote circumstance, not in itself a basis for such a cause. In other words, the law contemplates only a situation as regards an event, whether denominated a transaction, a matter, or a thing, where, under the constitutional privilege of silence, the person compulsorily called to testify might refuse to speak, but for removal of the precise danger which such privilege was designed to shield him from. So the statute becomes active whenever and wherever the constitutional privilege would otherwise operate; and its activity ceases when that would otherwise not intervene. It is a substitute, and that only.

These views are substantially in accord, as I understand the matter, with those expressed in the opinion in *Rudolph v. State* (opinion by Justice SIEBECKER), *post,* p. 222, 107 N. W. 466.

KERWIN, J. I concur in the foregoing opinion of Mr. Justice MARSHALL in so far as it expresses dissent from the view that our own immunity statute is broader than the constitutional privilege of silence as to self-incrimination; and I concur in the view that the statute operates only in cases where evidence is given under real compulsion and concerns, in some respect, an event giving rise to a criminal prosecution against the witness.

WINSLOW, J. (*concurring*). I agree fully with the con-
clusions reached, but not with some of the reasoning. The
immunity statute was passed to obviate the difficulty of ob-
taining testimony in criminal cases caused by the constitu-
tional guaranty that no person should be compelled to be a
witness against himself. This provision, as construed, means
that no person should be compelled to answer questions con-
cerning any matter when the court can see that his answers
might reasonably have a tendency to convict him of crime.
The immunity statute declares in substance that he shall be
compelled to answer such questions, but shall never be prose-
cuted on account of the matter concerning which he may so
testify. In my judgment the immunity statute is as broad
as the privilege which it was passed to obviate, and no broader.
In order to gain the immunity the witness must, in my opin-
ion, be *compelled* to testify. He could waive his constitu-
tional privilege by testifying voluntarily, he can likewise
waive his statutory immunity by doing the same thing. I
do not think that compelling a person to appear by subpœna
can properly be considered as compelling him to testify. It
was not so considered with regard to the constitutional guar-
anty. A person might be compelled by subpœna to attend,
but might testify voluntarily when so in attendance, and thus
waive his privilege. In like manner I think he may waive
his immunity. Otherwise the statute becomes a snare to the
prosecutor and a means of avoiding the just consequences of
crime. I do not mean by this that it is necessary for the wit-
ness to refuse to answer, but simply that he should make
known the fact that he does not testify voluntarily but only
in obedience to the command of the law and the court. When
this has been done he gains immunity from prosecution on
account of the transaction or matter concerning which he tes-
tifies, and not before.

In this case, therefore, I think there was no immunity on
two grounds: First, because the defendant testified volun-

tarily before the grand jury; he was not compelled to testify. Second, because he did not give any testimony concerning the transaction or thing for which he is now being prosecuted.

CASSODAY, C. J., took no part.